# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| AHLAM SAADON ANTEER, | ) | CASE NO. 3:20-CV-00952 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| *Acting Comm'r of Soc. Sec.*, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Ahlam Saadon Anteer (Plaintiff), challenges the final decision of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security (Commissioner), [1] denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. (Act). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to consent of the parties. (R. 17). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] Pursuant to Rule 25(d), the previous "officer's successor is automatically substituted as a party." Fed.R.Civ.P. 25(d).

## I.    Procedural History

On August 16, 2017, Plaintiff applied for SSI alleging a disability onset date of May 24, 2008. (R. 12, Transcript (Tr.) 96, 111-12, 128). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 111, 128). Plaintiff participated in the hearing on April 23, 2019, was represented by counsel, and testified. (Tr. 46-74). A vocational expert (VE) also participated and testified. *Id*. On May 7, 2019, the ALJ found Plaintiff not disabled. (Tr. 20-40). On March 1, 2020, the Appeals Council (AC) denied Plaintiff's request to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-6). Plaintiff's complaint challenges the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 12, 14, 18).

Plaintiff asserts that the ALJ's residual functional capacity (RFC) determination lacked substantial evidence. (R. 12, PageID# 1260).

## II.    Evidence

### A.    Relevant Medical Evidence[2]

#### 1.    Treatment Records

The ALJ's underlying decision included a detailed summary of Plaintiff's medical records, which the court includes verbatim:

> Treatment records from June 2016 indicate that the claimant was attending outpatient physical therapy for left knee pain at the University of Toledo Medical Center to increase knee flexion, strength, and to decrease pain. (Exhibit 17F /25-31 and 33-37)
>
> A left lower extremity venous scan showed no evidence of acute deep vein thrombosis in June 2016. (Exhibit Bl 7F/39)

---

[2]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and also deemed relevant by the court to the assignment of error raised.

In July 2016, the claimant presented to the University of Toledo Medical Center due to knee pain with associated locking, popping, and grinding. She reported that the knee pain started after moving furniture in the fall. She further complained of lower extremity swelling. An examination of her left knee showed tenderness of the medial joint line and lateral joint line with normal active range of motion. An x-ray of the left knee showed medial compartment degenerative change. The claimant was diagnosed with osteoarthritis of knee, an MRI of the claimant's knee was ordered, and she was to continue with physical therapy. She was to follow up with her primary doctor regarding her leg swelling. (Exhibit Bl 7F/6-8, 10, and 21) In addition, Gregory Otto, PA-C, noted based on her MRI results which showed degenerative tear medial meniscus body and posterior horn with partial displacement, moderately severe medial weightbearing osteoarthritis with spurring and subcortical bone edema, posterior weightbearing chondral surface showed near full-thickness loss, MCL deflection by partially extruded meniscus material and spurring, mucoid degeneration of ACL with 10 mm cyst near origin and subchondral edema and cystic change along the interspinous distal femur, septated intracapsular ganglion cyst versus scarred joint effusion above PCL, and joint effusion extends into the popliteus sheath with 5 mm loose body, that she should undergo left knee arthroscopy. (Exhibit Bl 7F/9 and 21) Thereafter, the claimant reported that she started physical therapy, was taking Meloxicam, and received injections by an outside surgeon with improvement in her left knee pain. (Exhibit Bl 7F/10 and 17)

The claimant underwent a bilateral lower extremity venous scan in February 2017, which showed no evidence of deep vein thrombosis, evidence of venous insufficiency in the common femoral vein and popliteal vein as well as superficial venous insufficiency in the greater saphenous vein and short saphenous vein on the left side. As well as an incompetent saphenofemoral junction (shows reflux), a reflux time of 2.26 seconds in the greater saphenous vein and 0.68 seconds in the short saphenous vein, and evidence of perforator vein reflux with a reflux time of 5.97 seconds. On the right side, the exam showed no evidence of deep vein thrombosis or superficial thrombus, evidence of deep system venous insufficiency, evidence of superficial venous insufficiency in the greater saphenous vein, and reflux time in the greater saphenous vein of 0.8 seconds. (Exhibit B2F/16) It was recommended by Dr. Jeremy Heffner that the claimant undergo a radio frequency ablation of the right greater saphenous vein, left greater saphenous vein, and left short saphenous vein, and left perforator vein. (*Id.*)

The claimant presented for an initial appointment at St. Rita's Professional Services with Dr. Jason Hageman to establish care in April 2017. The claimant reported chest pain, nausea and vomiting off and on that interrupted her sleep. She further reported that she had a history of a seizure disorder for which she had been prescribed Topomax. It was noted that the claimant was presently in pharmacy school at ONU. A physical examination was unremarkable. The claimant was prescribed Zofran for her reported nausea and vomiting, she was to keep her cardiologist appointment for her chest pain, and she was to follow up with her neurologist regarding her seizure disorder. (Exhibit B3F/8-10)

In March 2017, a duplex exam of the claimant's lower left extremity showed no evidence

of deep vein thrombosis or superficial venous thrombus, the greater saphenous vein ablation appears complete, however, there is residual patency below the knee, and a left groin lymph node, 2.27 cm, was visualized. (Exhibit B2F/11) She later underwent a left lower extremity vein ablation of the greater saphenous vein by Dr. Heffner. (Exhibit B2F/30)

The following month, the claimant underwent a left lower extremity vein ablation of the short saphenous vein by Dr. Heffner. (Exhibit B2F/29)

In May 2017, the claimant underwent vein ablation of greater saphenous vein in her right lower extremity and left lower extremity vein ablation of a perforator 13 cm's from the medial malleolus by Dr. Heffner. She tolerated the procedure well, compression dressings were applied, and she was scheduled for a follow up ultrasound exam. (Exhibit B2F/27 and 28)

Additional duplex images of the claimant's right lower extremity were completed which showed no evidence of deep vein thrombosis or superficial venous thrombus, the great saphenous vein ablation appears complete, and evidence of deep venous insufficiency in the popliteal vein. (Exhibit B2F/6)

Later that the month, the claimant was examined by Jenelle Niese, CNP, with St. Rita's Professional Services. She reported that she was feeling down more than normal thinking about how she had lost her family traumatically as a Syrian refuge. She reported that she was short of breath, was having dysuria, and having syncope. Upon examination, she exhibited normal range of motion, bowel sounds were normal, she had a normal heart rate and rhythm, breath sounds were normal, and she had a normal mood, affect, and behavior. It was noted that the claimant had a positive depression screening and she was assessed with mild single episode of major depressive disorder for which she was prescribed Zoloft and was to keep her appointment with Dr. Roy. (Exhibit B3F/20-21)

In June 2017, the claimant returned for a follow up visit with Dr. Heffner, post vein ablation ultrasound. It was noted that she continued to complain of cramping and heaviness and swelling in the right lower extremity. Ultrasound imaging showed that the left perforator vein had some reflux for which treatment was recommended. The claimant was examined and was noted to have varicose veins in her right lower extremity with spider veins present in the medial calf with 3+ swelling in the left lower extremity and 2+ swelling in the right lower extremity. Dr. Heffner diagnosed the claimant with varicose veins with pain, bilateral, and varicose veins of both legs with edema. It was recommended that she continue wearing the compression stockings, attend postural therapy, and to take NSAIDs for pain. (Exhibit B2F/31-32)

Later that month, the claimant presented to the emergency department at Lima Memorial Hospital with reports of anxiety/panic attack after receiving a "bad" email. She reported her symptoms included shortness of breath, heart palpitation, and syncope. The claimant was examined by the attending physician and was noted to have normal physical

examination findings including no evidence of edema and full range of motion. An EKG was normal. Her mood, speech, cognition and process were all reported as normal. The claimant was assessed with panic attack/anxiety, was discharged the same day, and was to follow up with her primary doctor in 1 week. (Exhibit B1F/1-5)

The claimant followed up with her provider, Venkat Batulla, MD, who reviewed her test results from previous cardiovascular procedures including an echocardiogram and stress test. The echocardiogram showed an ejection fraction of 65%, mild left ventricular hypertrophy, and left ventricular diastolic relaxation abnormality stage 2 while the stress test showed non ischemic cardiographic response without evidence of MI or infarction. (Exhibit B2F/5 and 35 and B1F/10) The claimant was assessed with atypical chest pain and panic disorder which was panic/anxiety related for which she advised to follow up with a psychiatrist. (Exhibit B2F/37)

Thereafter, the claimant presented for an appointment with Coleman Behavioral Health for an ongoing psychiatric assessment. The claimant reported that her mood was "ok" and her goal was to graduate from Ohio Northern University and get a job so she was able to fully support herself. (B5F/1-2) It was further noted that she did not have any issues with memory, orientation, ability to abstract, and attention/concentration, and her intelligence was estimated at above average. (Exhibit B5F/2) Later that month, her mood was reported as anxious and she displayed a demanding demeanor with agitated behavior. It was noted that the claimant was in a panic as her landlord had not picked up her rent money and she was fearful that she was going to be evicted as her landlord wanted her to end her lease in June, prior to the lease termination, so that he could rent to other people. (Exhibit B5F/4-6) The claimant requested that a letter be provided to the Dean of Admissions at ONU so that she could have 50% extra time for exams and quizzes due to anxiety and one was provided. (Exhibit B5F/9)

In the same month, the claimant underwent a vein ablation of the greater saphenous vein in her left lower extremity by Dr. Haffner. (Exhibit B2F/26) The claimant tolerated the procedure well, compression dressings were applied, and she was scheduled for a follow-up ultrasound. (*Id.*)

Thereafter, the claimant had a left lower extremity venous ultrasound which showed no evidence of deep vein thrombosis or superficial venous thrombus, the great distal saphenous vein ablation appears complete, and evidence of deep system venous insufficiency in the common femoral and popliteal veins. (Exhibit B2F/1)

Treatment notes from a follow up appointment with Jenelle Niese, CNP in August 2017 indicate that the claimant was continuing to have swelling in her lower extremity and she had 1+ bilateral edema to the ankles. The claimant reported that she was wearing her compression stockings intermittently. Otherwise, the claimant denied having any chest pain and a cardiovascular exam was normal. The claimant was advised to continue wearing her compression stockings, was prescribed Lasix, and was referred to physical therapy for her leg swelling and pain. (Exhibit B3F/42-43)

The claimant underwent a physical therapy assessment by Heather Shininger, PT and it was determined that physical medicine and rehabilitation services were necessary on an outpatient basis due to her leg swelling and chronic pain of her bilateral lower extremities for 8 weeks 2-3 times weekly. (Exhibit B8F/54 and 58) Thereafter, the claimant began physical therapy with St. Rita's Medical Center Outpatient Rehabilitation Center. (Exhibit B8F/56-63)

The claimant also continued treating with Coleman Case Management/Coleman Behavioral Health. In August 2017, it was noted that she had been evicted from her apartment and had found shared housing with other students in Ada and had rented out one bedroom. Her previous apartment was observed to be extremely clean and emptied. She appeared to be tired and short of breath after moving out her items. CPST helped the claimant move her items and she reported that she was "relieved" and had no other concerns. (Exhibit B5F/39-40) The following month, the claimant reported that school was going well and she was feeling positive about her new housing. (Exhibit B5F/43)

During a psychiatric telemedicine visit with Cherie Tubeileh, the claimant reported that she was doing well on Zoloft and Vistaril. She denied any side effects or problems. She reported that her depression comes and goes based on the day's events/stressors, but overall, she was managing well and her anxiety was minimal while her sleep and appetite were "ok." She denied any significant mood swings and reported that she does not take Visatril too often as she did not need it as much as before. She further denied having any nightmares or flashbacks. As to her medical impairments, she reported that she was stable and she was tired a lot from standing on her feet at the pharmacy with some leg pain, but nothing significant. She reported her mood as "good" and had good insight and judgment. (Exhibit B5F/99-101) The claimant was to continue taking Zoloft 50 mg po qHS, Vistaril 25 mg po TID, as needed, and was counseled about a healthy diet, good sleep hygiene, and exercise. (Exhibit B5F/102)

In September 2017, the claimant underwent a diagnostic assessment with Coleman Behavioral Health with Kristin Thain. She reported that she had stopped taking her medications a year ago and wanted to see Dr. Roy. She reported that she was in new pharmacy program and she is unable to concentrate, focus, and she keeps crying. She reported that she has anxiety and has a very sad life as she lost all her family in the war. She further reported having [thoughts of self harm], however, she denied any intent to act on those thoughts presently. She reported witnessing war and violence in Iraq and sometimes having intrusive memories when she is alone. She further reported sleeping only 3-4 hours and problems concentrating while taking tests. The claimant was assessed a GAF score of 50. (Exhibit B5F/57-61) She was observed to have a depressed mood with a constricted affect. (Exhibit B5F/62) The claimant was diagnosed with major depressive disorder with anxious distress and unspecified trauma and stressor related disorder. (Exhibit B5F/66)

\*\*\*

6

During a mental health visit with Coleman Case Management [on December 19, 2017], the claimant was observed to be well groomed, cooperative, and made average eye contact with the provider. Her mood was observed as stressed with a full affect. The claimant reported feeling stressed due to recent medical issues that prevented her from finishing her semester/finals in school. She reported that she did not need any assistance in the near future due to having stable housing, the means to attend her doctor appointments, and was feeling psychiatrically stable. (Exhibit B7F/9)

In late October 2017, the claimant presented for a follow up with Jenelle Niese, CNP, regarding extremity weakness in her hands. The claimant reported feeling weak with muscle aches all over. She reported that she was formerly diagnosed with asthma for which she takes Symbicort daily and uses Albuterol a couple times a day. She reported having a dry cough with some wheezing and throat pain. Upon examination, the claimant was observed to have normal breath sounds and she had 1+ bilateral edema to ankles. The claimant was to see an Endocrinologist in December 2017 and was diagnosed with mild intermittent asthmatic bronchitis with acute exacerbation for which she was prescribed Zithromax, was to continue using Albuterol as needed, and received a Solu-Medrol injection. (Exhibit B9F/52-55)

The claimant later reported that attending aquatic therapy was helping and the swelling in her legs had reduced, however, she was still having pain which she rated an 8 on a scale of 10. She was to continue with physical therapy once a week every other week, at her request, due to her schedule. (Exhibit B8F/55) Later in November 2017, the claimant called to cancel physical therapy due to a new symptom and she was discharged at her request. (Exhibit B8F/56)

On December 12, 2017, the claimant presented to St. Rita's Medical Center emergency department with reports of numbness in her left arm and left leg. The claimant reported that she had passed out at school 5 minutes prior to her admission. The claimant was admitted to the hospital for a carotid left study, paresthesias left acute but weakness of left arm resolving, and thyroid and vascular evaluation. (Exhibit B8F/23-24) During her admission she received occupational therapy services. It was noted that she would benefit from continued occupational therapy services on an outpatient basis to address her left upper extremity acute weakness and left lower extremities pain. She was noted to walk without any assistive devices and had high stress levels secondary to being a "full time" student in a pharmacy program. (Exhibit B8F/40) The claimant was subsequently discharged to home on or about December 15, 2017 (Exhibit B9F/36)

The claimant presented for an appointment with Jenelle Niese, CNP, later in December 2017 and reported that she had been discharged from the hospital after having a single syncopal episode. She reported having persistent left arm pain and weakness but denied any dizziness, headaches, or additional syncopal episodes, chest pain, or shortness of breath. Additional treatment notes indicate that she denied having any seizures in years. Upon examination, she exhibited a normal mood and affect, she had normal breath sounds,

and she had 1+ bilateral edema to ankles in her lower extremities. An echocardiogram showed an ejection fraction visually estimated at 60% with overall left ventricular function being normal. A CT of her brain showed no mass effect or acute hemorrhage. The claimant was assessed with history of syncope, seizure disorder, and was to have an EMG for further evaluation of her arm pain. (Exhibit B9F/63-68)

In the same month, she was evaluated by Natallie Papjanchith, CNP with St. Rita's Professional Services and Medical Center with complaints of joint stiffness, numbness, and pain. She reported the inability to use full function of her left hand and lower back pain for which she received steroids and reported some relief. Upon examination, she was observed to have a normal mood and affect, she had normal range of motion, and she denied having any dizziness or seizures. (Exhibit B9F/4-6)

She was also evaluated by Cherie Tubeileh with Coleman Behavioral Health later that month for a medication review. She reported that she was compliant with her medications, her mood was stable, and she was having no problems with depression, anxiety, or mood swings. She reported that her energy level was poor and she was observed to be lying down in the waiting room. The claimant was requesting a medical excuse to stay [sic] she did not have to take her exams this week to which the provider did not comply. Upon examination, she was noted to be mistrustful, withdrawn, preoccupied, and demanding, she made normal eye contact, she had a flat affect, circumstantial thought process, and limited insight and judgment. The claimant was to continue taking Vistaril and Zoloft as prescribed. (Exhibit B7F/11-15)

In January 2018, the claimant presented for an appointment with Orthopaedic Institute of Ohio with Faye Imm, PA-C due to slight paresthesia in her left hand with pain with pinch and grip. She reported that she was dropping things quite often and it is difficult for her to hold a cup of tea. An electrodiagnostic nerve test results was reviewed which showed evidence consistent with mild to moderate left median neuropathy across the wrist (carpal tunnel syndrome) and no evidence of cervical radiculopathy in the left upper extremity. Her left hand was examined and was observed to have full range of motion with slight swelling. She reported pain with range of motion of the thumb joint, however, there was no crepitus. She had full digital motion without triggering and a negative Finkelstein's test. Her right hand was observed to have full digital motion without swelling and some pain upon range of motion of the thumb joint without crepitus. The claimant was assessed with left carpal tunnel syndrome for which she was prescribed a wrist splint. (Exhibit B1 lF/1-2 and B20F/8-9)

She also presented for an appointment with the University of Toledo Medical Center for an appointment with Navya Parsa, MD, Rheumatology. She reported bilateral knee pain and fatigue. She reported that she does not take any medications for pain as this affects her seizure disorder. It was noted that the claimant had a prior meniscal tear in 2016 and was recommended to have arthroscopy but she did not follow through with this. She continued to complain of pain and swelling in the left knee which affected her mobility. She further reported that she had developed pain in her right knee as well. Upon

examination, she was noted to have restricted range of motion to full flexion, worse on the left than right, there was a left sided small effusion with tenderness to palpation medially and laterally with prominence of prepatellar fat. Dr. Parsa diagnosed the claimant with osteoarthritis of knee for which she was to be referred to an orthopedist and was recommended to take over the counter NSAIDs or acetaminophen. (Exhibit Bl 7F/1-7)

The following month, she attended an appointment with Jenelle Niese, CNP to have disability paperwork completed. The claimant reported that she was wearing splints for her carpal tunnel syndrome and cannot lift anything for even 1 to 2 minutes. She further reported that she is unable to walk a block without having pain in all her extremities, she has to take 15 minute breaks every hour, and she has trouble concentrating and focusing. Upon examination, the claimant was observed to be alert and oriented to person, place, and time, she displayed a normal heart rate and rhythm, she had normal breath sounds, she was observed to have 1+ bilateral edema to ankles, she had normal range of motion, and she had a negative Tinel and Phalen test. However, she was observed to display a depressed mood and she was slowed. The claimant's physical form was completed, an MRI of her left knee was reviewed and charted, and she was recommended to continue wearing wrist splints. (Exhibit B15F/95-98) Two months later, the claimant reported having chronic anxiety and difficulty concentrating in school and was prescribed Wellbutrin XL 150 mg once daily by this provider. (Exhibit B15F/109-111)

She also presented for a medication management appointment with Cherie Tubeileh with Coleman Professional Services [on February 27, 2018]. It was noted that the claimant presented with a bright and smiling affect. She reported that the medications were effective in treating her depression and anxiety symptoms and she was sleeping well. It was further noted that the claimant was out of the pharmacy program at ONU and remained in Political Science. A mental status exam noted that she was cooperative, with a full/euthymic mood, she demonstrated a logical thought process, and was alert and oriented to all spheres. Her medications were continued as they were effective in managing her symptoms. (Exhibit B16F/3-6) In addition, during a routine check-in by Coleman Professional Services CPST, the claimant reported that her medical issues were "under control" and she was practicing good sleep hygiene causing her to sleep well at night. She further reported [on January 4, 2018] that her anxiety had reduced 50% because she had a lawyer assisting her with her social security application. (Exhibit B16F/[21]23)

In May 2018, the claimant attended a follow up appointment with Jenelle Niese, CNP. She was noted to have leg swelling and chronic leg pain which caused her difficulty walking sometimes as she does not like to use her compression stockings. She reported that she was no longer following with neurology regarding her previous history of pseudo seizures. Upon examination, the claimant was observed to have +2 non pitting edema to ankles but otherwise had normal range of motion. The claimant was prescribed a cane for her leg swelling. In addition, the claimant was referred to neurology for further [sic] related to her pseudo seizures. (Exhibit B15F/118-121)

In August 2018, Coleman Professional Services TBS met with the claimant in her home.

She reported that she was "doing well and was happy with her life." She reported that she was active in pharmacy school and was receiving good grades. (Exhibit B16F/31)

The claimant presented for an appointment with Jenelle Niese, CNP, in September 2018 due to right knee pain and lower leg swelling. She reported that she was occasionally wearing her compression stockings. Upon observation, she was noted to have 2+ edema bilateral to ankles with some swelling in her right knee with no LCL and MCL laxity. Otherwise, she displayed normal range of motion and had no cranial nerve deficits. In addition, her mood and affect were normal. The claimant was to have an x-ray of her right knee and was prescribed a Medrol Dosepack. (Exhibit B15F/129-132) A couple weeks later, she reported to Jenelle Niese, CNP during a follow up exam that her knee pain had improved and was very minimal now. She further reported difficulty concentrating on her exams when people are getting up on completion and feeling anxious. She requested that a note be provided to allow her to take her exams in separate quiet room. It was noted that her knee pain was stable and she was provided with a note for her school. (Exhibit B15F/151-154)

In October 2018, the claimant presented for an appointment with Coleman Professional Services with Sonal Sinha. She reported that she ran out of her medications as she had been having issues with getting an appointment. She reported that her mood had been up and down without her medications. It was noted that the claimant was working at school and was looking forward to Thanksgiving. The claimant's medications were restarted and the provider further noted that her depression and anxiety was under control with medication and she was able to attend college classes and was able to learn without difficulty or impairment. (Exhibit B16F/9-13)

The claimant presented for an appointment with Sonal Sinha with Coleman Professional Services in January 2019. The claimant reported that she "was doing well" and that the holidays were "ok" for the most part. She reported that her sleep was "ok" but was interrupted at times. The claimant was noted to weigh 161.2 pounds and was 5'6" tall. She walked with a normal gait, her mood was noted as "up and down," and she had limited/fair insight and judgment. She was to continue taking her medications as prescribed. (Exhibit B16F/15-19) Additionally, treatment notes from Jenelle Niese, CNP, that same month indicate that the claimant's asthma was stable and she was to continue taking her prescribed medications. (Exhibit B15F/166)

Later the following month, the claimant reported that she was continuing to have problems with her sleep and has been "up and down" due to pain issues, however, her pain was noted as "better" due to not working at the school. The claimant was prescribed Trazadone 50 mg QHS and was to continue taking Zoloft and Vistaril as prescribed. (Exhibit B18F/3-8)

(Tr. 29-37).

10

## 2.    Medical Opinions Concerning Plaintiff's Functional Limitations

On October 27, 2017, state agency physician Rannie Amiri, M.D., reviewed Plaintiff's physical medical records. (Tr. 99-105). Dr. Amiri opined that Plaintiff can lift/carry 20 pounds occasionally and 10 pounds frequently, she can sit/stand/walk about 6 hours in an 8-hour workday, she can frequently climb ramps and stairs, she can never climb ladders, ropes, or scaffolds, she can frequently crawl, she should avoid concentrated exposure to odors, dusts, gases, poor ventilation, etc., and she should avoid all exposure to hazards such as commercial driving, operating dangerous machinery, and unprotected heights. (Tr. 103-105). On February 26, 2018, state agency physician Maureen Gallagher, D.O., concurred with Dr. Amiri's opinion. (Tr. 121-23).

On October 27, 2017, state agency psychologist Deryck Richardson, Ph.D., reviewed Plaintiff's mental health records. (Tr. 106-08). Dr. Richardson opined that Plaintiff is "limited to static tasks that do not require her to remember more than 2-3 step instructions to complete the work that is assigned." (Tr. 106). In addition, she was limited to "static tasks that to not require her to carry out more than 2-3 step instructions at a time and do not require her to maintain intense concentration for extended periods of time or meet strict deadlines or work quotes. She is restricted to tasks that do not require a rapid pace." (Tr. 107). Finally, Dr. Richardson opined that Plaintiff was "limited to occasional superficial interaction with the general public and occasional needs based interaction with fellow co-workers." (Tr 107). On February 26, 2018, state agency psychologist Carl Tishler, Ph.D., concurred with Dr. Richardson's opinion. (Tr. 123-125).

On February 8, 2018, Certified Nurse Practitioner Janelle Niese completed a Physical Assessment opinion. (Tr. 869-70). NP Niese listed Plaintiff's diagnoses as: "seizure disorder, hyperthyroid, and carpal tunnel." (Tr. 869). She opined that Plaintiff's impairments were constantly severe enough to interfere with the attention and concentration required to perform simple work-related

tasks. (Tr. 869). She further opined that Plaintiff would need to recline or lie down in excess of breaks in a typical work-day, could sit for eight hours and stand/walk for only 5-7 minutes in an eight-hour workday. (Tr 869). NP Niese opined that Plaintiff could not walk any city blocks without rest or significant pain and would need hourly breaks of 10-15 minutes. (Tr. 869). NP Niese opined that Plaintiff could never lift any weights under fifty pounds. (Tr. 869). She opined that Plaintiff could only use her upper extremities for gross and fine manipulation and reaching for twenty-five percent of the workday (Tr. 869) and that she would be absent from work more than four times a month. (Tr. 870).

### B.    Relevant Hearing Testimony

At the April 23, 2019 hearing, Plaintiff testified as follows:

- She was fired from her position working in a cafeteria at Ohio Northern University (ONU), because she needed to remove her shoes and elevate her legs during breaks. (Tr. 51-2). She stated that job involved continuous standing and lifting up to 50 pounds. (Tr. 52-53). She was unable to work because she could not find a job, the area she lived in was too small, and she did not have a driver's license. (Tr. 52). Since 2006 she could only walk for ten minutes at a time. (Tr. 53-54). She walks from her school to her home. (Tr. 53). It was hard for her to bend, she could not squat and could only lift five pounds. (Tr. 54).

- The veins in her legs hurt and surgery did not help. (Tr. 57). Her legs swelled causing constant pain unless she was in bed. (Tr. 58). She stated that her doctor told her there was nothing she could do for the swelling other than elevate them or take a rest. (Tr. 59).

- She could only be on her feet for two hours. (Tr. 61). She stood longer when she was working, because she had to but it was hard. She never left early or showed up late and never called off due to her leg pain. (Tr. 61). She used her prescribed compression stockings for two years, but they did not solve the problem. (Tr. 61).

- She had issues with her hands due to a stroke. (Tr. 62). Mental health issues impact her ability to work because she cannot focus. She was removed from the pharmacy program at ONU because she failed an exam. (Tr. 63).

- Plaintiff testified that she had depression, but medicine worsened her physical issues. (Tr. 67). She had a thyroid condition that also affects her mood, and she struggles to get out of bed four or five times a month. (Tr. 67-8).

During the administrative hearing, the ALJ posed the following hypothetical question to the VE:

> First hypothetical assume that a hypothetical individual of the claimant's age, education, and work experience has the residual functional capacity for work at the light exertional level. Postural limitations of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Occasional crawling. Occasional use of the bilateral lower extremities for operation of foot controls. Manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery, commercial driving, and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases. Work limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements such as, moving assembly lines and conveyor belts, involving only work-related decisions with few, if any workplace changes. Occasional interaction with the general public, coworkers and supervisors. Mr. Coleman, would there be any work in the national economy for a hypothetical individual with that first residual functional capacity?

(Tr. 69). The VE testified that such an individual could work as an office helper or clerical assistant DOT 229.567-010, SVP 2, unskilled, light level, with 83,250 such jobs in the national economy, mailroom clerk DOT 209.687-026, SVP 2, unskilled, light level, with 24,770 such jobs in the national economy, and cafeteria attendant DOT 311.677-010, , SVP 2, unskilled, light level, with 278,470 such jobs in the national economy. (Tr. 70).

The ALJ added the further limitation that the individual would be "off task up to ten percent of the work period." (Tr. 70). The VE testified "if an employee reaches ten to twelve percent off task outside of scheduled breaks and lunch breaks in a competitive eight-hour work period, essentially over a long period of time they're not performing the essential duties…." (Tr. 70). The ALJ posed the following third hypothetical to the VE:

> Add to the limitations that I gave you in the first hypothetical, still at light, the sit/stand option under which the hypothetical individual will be allowed to sit or stand alternating position for one or two minutes, in the immediate vicinity of the workstation no more frequently than every 30 minutes.

13

(Tr. 71). The VE testified that such an individual could perform the jobs stated for hypothetical one. (Tr. 71). The ALJ continued:

> For the next hypothetical, please go to the sedentary exertional level and at sedentary I want you to use the hypothetical limitations from the first hypothetical and the sit/stand option at sedentary with the limitations from the first hypothetical plus the sit/stand option, would there be any work in the national economy?

(Tr. 72). The VE testified that such an individual could work as a surveillance system monitor DOT 379.367-010, SVP 2, unskilled, sedentary, with 79,470 jobs in the national economy, addresser or address clerk DOT 249.587-010, SVP 2, unskilled, sedentary, with 22,500 jobs in the national economy, and document preparer DOT 249.587-018, SVP 2, unskilled, sedentary, with 54,120 jobs in the national economy,. (Tr. 72).

> Finally, the ALJ posed the following hypothetical:

> [A]t any exertional level, starting with the limitations that I gave you in the first hypothetical, please add the following limitations. The hypothetical individual is totally unable to perform work even at the sedentary exertional level. Manipulative limitation of occasional use of the bilateral upper extremities for reaching, handling, and fingering. Consistently allowed to take thirteen extra breaks of fifteen minutes each per eight-hour work shift, in addition to regularly scheduled breaks. Consistently absent more than four days per month. Allowed to consistently be off task more than twelve percent of the work period. Occasionally allowed to lie down on the job. The hypothetical individual is able to sit for eight hours of an eight - hour workday. And able to stand and/or walk in combination, for seven minutes of an eight-hour workday.

(Tr. 72-73). The VE testified that there was no work in the national economy for such an individual. (Tr. 73). The VE further testified that the tolerance for monthly absences is half a day to a day per month. *Id*.

### III.    Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health*

14

& *Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner determines whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that she suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent her from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent her from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

IV.     **Summary of the ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since August 16, 2017, the application date (20 CFR 416.971 *et seq.*).

2.      The claimant has the following severe impairments: seizure disorder/epilepsy; mood disorder; reactive airway disease/asthma; generalized anxiety disorder; osteoarthritis of the knee joint; varicose veins in lower extremities/venous insufficiency/lower extremity edema, status post surgery; and trauma disorder (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: Postural limitations of no climbing of ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Occasional crawling. Occasional use of the bilateral lower extremities for operation of foot controls. Manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery, commercial driving, and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any workplace changes. Occasional interaction with the general public, co-workers, and supervisors. Allowed to be off task up to 10% of the work period, but not consistently.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on *** 1968 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since August 16, 2017, the date the application was filed (20 CFR 416.920(g)).

(Tr. 23-38).

## V.     Law and Analysis

### A.     Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889

F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.      *Plaintiff's Assignments of Error*

Plaintiff's assignments of error assert that the ALJ's determination of her residual functional capacity (RFC) was not supported by substantial evidence because 1) the ALJ "did not elicit any VE testimony concerning the effect of leg elevation on the availability of work" and 2) the ALJ "failed to duly explain the weights afforded the opinion evidence." (R. 12, PageID# 1275, 77).

The RFC is an indication of an individual's work-related abilities despite their limitations. *See* 20 C.F.R. § 404.1545(a). The ALJ bears the responsibility for assessing a claimant's RFC, based on the relevant evidence. *See* 20 C.F.R. § 404.1546(c). The ALJ's hypothetical questioning to a vocational expert during an administrative hearing must precisely and comprehensively set forth every physical and mental impairment that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by evidence in the record, it need not reflect unsubstantiated allegations by the claimant. *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).

In addition, testimony from a vocational expert—in response to a hypothetical question— may constitute substantial evidence that a claimant retains the ability to perform specific jobs, so long as the hypothetical question accurately accounts for a claimant's physical and mental impairments. *See, e.g., Pasco v. Comm'r of Soc. Sec.*, 137 Fed. App'x 828, 845 (6th Cir. 2005) (citing *Varley*, 820 F.2d at 779)). However, "[t]he rule that a hypothetical question must incorporate all of the claimant's physical and mental limitations does not divest the ALJ of his or

her obligation to assess credibility and determine the facts." *Griffeth v. Comm'r of Soc. Sec*., 217 Fed. App'x 425, 429 (6th Cir. 2007) (quoting *Redfield v. Comm'r of Soc. Sec*., 366 F. Supp.2d 489, 497 (E.D. Mich. 2005)). In other words, when an ALJ presents hypothetical question(s) to the VE, the ALJ is required to incorporate only those limitations that have been accepted as credible. *Griffeth*, 217 Fed. App'x at 429 (citing *Casey v. Sec'y of Health & Human Servs*., 987 F.2d 1230, 1235 (6th Cir. 1993)); *Stanley v. Sec'y of Health & Human Servs*., 39 F.3d 115, 118-19 (6th Cir. 1994)); *Elliott v. Comm'r of Soc. Sec*., No. 1:09cv2260, 2011 WL 400101 (N.D. Ohio, Jan. 11, 2011) (Armstrong, M.J.) (citing *Gant v. Comm'r of Soc. Sec*., 372 Fed. App'x 582 (6th Cir. 2010)) (same), adopted by 2011 WL 441518 (Feb. 4, 2011) (Gaughan, J).

### 1. The Impact of Leg Elevation on the RFC

In her first assignment of error, Plaintiff contends that the ALJ erred by not eliciting any VE testimony concerning the impact of leg elevation on the availability of work. (R. 12, PageID# 1275). Specifically, Plaintiff contends that "[g]iven the evidence showing venous insufficiency, edema, and chronic leg pain, the ALJ should have felt compelled to inquire specifically as to the effect of leg elevation on the ability to work. This omission prevents a reasonable mind from accepting the ALJ's evidence as sufficient to support the ALJ's decision of non-disability, thereby failing the substantial evidence standard." (R. 12, PageID# 1276). At its core, Plaintiff's argument is that the ALJ failed in his duty to develop the record. (R. 12, PageID# 1276, citing *Cox v. Comm'r of Soc. Sec.,* 615 F. App'x 254, 262 (6th Cir. 2015)).

The Commissioner asserts that the "ALJ reasonably considered both Plaintiff's subjective reports and the objective medical evidence in reasonably determining that despite her complaints of leg swelling and pain, she remained capable of work in line with the RFC." (R. 14, PageID#

1293). The court concludes that the ALJ considered the evidence Plaintiff cites regarding her leg

pain and based the RFC upon the whole record.

While an ALJ has a "duty to develop the record," *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x

254, 262 (6th Cir. 2015), she also "has the discretion to determine whether additional evidence is

necessary." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (citing *Foster v.

Halter*, 279 F.3d 348, 355 (6th Cir. 2001)). Pursuant to the regulations, if record evidence is

incomplete or insufficient to support a disability determination, the ALJ may recontact medical

sources, request additional existing medical records, ask the claimant to undergo a consultative

examination, or ask the claimant for more information. 20 C.F.R. § 416.920b(b)(i)—(iv).

However, the regulations do not require an ALJ to obtain further evidence where the record is

already sufficient. *Foster*, 279. F. 3d at 355-56.

In *Deskin v. Comm'r of Soc. Sec*., the court reviewed a case in which there was only one

medical opinion, from a state agency reviewing physician who considered the record two years

before the ALJ made an RFC finding. 605 F. Supp. 2d 908 (N.D. Ohio 2008). The *Deskin* court

set forth the following rule:

> [When] the transcript contains only diagnostic evidence and no opinion from a
> medical source about functional limitations (or only an outdated nonexamining
> agency opinion), to fulfill the responsibility to develop a complete record, the ALJ
> must recontact the treating source, order a consultative examination, or have a
> medical expert testify at the hearing. This responsibility can be satisfied without
> such opinion only in a limited number of cases [in which] the medical evidence
> shows relatively little physical impairment and an ALJ can render a commonsense
> judgment about functional capacity.

*Id*. at 912 (quotation marks and citation omitted). The same court had an opportunity to clarify the

scope of the *Deskin* decision in *Kizys v. Comm'r of Soc. Sec*., No. 3:10-cv-25, 2011 WL 5024866

(N.D. Ohio Oct. 21, 2011). *Kizys* clarified that *Deskin* potentially applies in only two

20

circumstances: 1) when an ALJ made an RFC determination based on no medical source opinion;

or 2) when an ALJ made an RFC based on an "outdated" medical source opinion "that does not

include consideration of a critical body of objective medical evidence." *See Kizys*, 2011 WL

5024866, at *2; *see also Raber v. Comm'r of Soc. Sec.*, No. 4:12-cv-97, 2013 WL 1284312, at *15

(N.D. Ohio Mar. 27, 2013) (explaining post-*Deskin* application of the rule).

> Without doubt, it is the ALJ's responsibility (not a physician's) to determine a
> claimant's RFC based on the evidence as a whole. Equally clear is the claimant's
> burden to produce evidence in support of his claim. But, once it is determined that
> the evidence supports a finding of a severe impairment, the ALJ may be obligated
> to develop a record that provides substantial evidence supporting his or her RFC
> finding. The question then becomes, 'did the ALJ have a responsibility to further
> develop the record in this case?'

*Falkosky v. Comm'r of Soc. Sec.*, No. 1:19-CV-2632, 2020 WL 5423967, at *6 (N.D. Ohio Sept.

10, 2020). Plaintiff's argument does not involve either of the two circumstances in *Deskin* as

clarified in *Kizys*. In the present case, there are multiple medical source opinions concerning

Plaintiff's functional limitations, none of which Plaintiff argues failed to "include consideration of

a critical body of objective medical evidence." *Kizys*, 2011 WL 5024866, at *2. Accordingly, there

was sufficient evidence for the ALJ to evaluate Plaintiff's conditions.

Here, the ALJ concluded that Plaintiff's lower extremity edema was a severe impairment.

(Tr. 23). The ALJ discussed Plaintiff's testimony on this issue as follows:

> As to her leg swelling/pain/fatigue, she reported that Topomax also causes swelling
> in her legs and she had surgery at Lima Memorial in 2016/2017. She testified that
> her pain in her legs prevents her from moving or walking and the pain comes and
> goes. She testified that her legs are swollen all the time and the swelling is reduced
> by laying down. She further testified that her swelling increases by the end of the
> day or when carrying anything heavy. She testified that her doctor has told her there
> is nothing to do for the swelling except rest or elevate her legs but she does not do
> this as she has to sit on the computer while looking for jobs and while she works
> on finishing her thesis. She testified that she sometimes put her legs up while at
> school and lays down at night. She testified that she formerly used compression
> stocking prescribed by her physician for 2 years but has since stopped using them

> as they did not solve her problem. She reported that she searches for work as a researcher or for jobs working in the laboratory. She testified that she would not be able to complete an 8 hour workday as she cannot stand on her legs for more than 2 hours. (see hearing testimony)

(Tr. 28).

As stated above, an ALJ need only include those limitations in an RFC that are found credible. Here, the ALJ concluded that although Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are *not entirely consistent* with the medical evidence and other evidence in the record…." (Tr. 29) (emphasis added). In other words, the ALJ found Plaintiff was not fully credible, which would include Plaintiff's self-reported need to elevate her legs.[3] Then, over eight pages (set forth above), the ALJ thoroughly discussed Plaintiff's medical history and records in support of the RFC. (Tr. 29-37). Moreover, the ALJ noted—as Plaintiff acknowledges—that Plaintiff was prescribed a cane due to leg swelling and that she had a history of ablations. (R. 12, PageID# 1277). But Plaintiff has not identified any medical opinion or treatment record that supports the contention that she required the ability to elevate her legs at work.

Plaintiff's sole argument here is that the ALJ failed to elicit testimony from the VE concerning the effect of leg elevation on work availability. (R. 12, PageID# 1275). However, the ALJ was under no obligation to present a hypothetical question to the VE incorporating a limitation deemed not credible. *Griffeth*, 217 Fed. App'x at 429. Accordingly, Plaintiff's first assignment of error is without merit.

---

[3] It also bears noting that Plaintiff has not expressly challenged the ALJ's credibility analysis.

### 2. The ALJ's Weight Explanations

Plaintiff's second assignment of error contends that the ALJ excluded aspects of the state agency psychologists' opinions despite finding them persuasive, and failed to adequately explain the basis for rejecting NP Niese's opinion. (R. 12, PageID# 1277).

### a) Dr. Richardson and Dr. Tishler

Plaintiff contends that the ALJ erred by failing to acknowledge and incorporate limitations into the RFC that were set forth in the opinions of state agency psychologists Dr. Richardson and Dr. Tishler. (R. 12, PageID# 1279). Specifically, Plaintiff asserts that although the ALJ acknowledged that Plaintiff should be limited to tasks that do not require her to remember more than 2-3 step instructions to complete, he failed to acknowledge that Plaintiff is also limited to carrying out no more than 2-3 step instructions at a time. (*Id.*).

In their opinions, the doctors explained that Plaintiff's limitations in understanding and memory included the ability to perform "static tasks that do not require her to remember more than 2-3 step instructions to complete the work that is assigned." (Tr. 106, 123). With respect to Plaintiff's ability to sustain concentration and persistence, the same doctors explained that Plaintiff "would be limited to static tasks that do not require her to carry out more than 2-3 step instructions at a time and do not require her to maintain intense concentration for extended periods or meet strict deadlines or work quotas. She is restricted to tasks that do not require a rapid pace." (Tr. 107, 124). Plaintiff asserts that the ALJ, without explanation, failed to incorporate the doctors' limitations regarding concentration and persistence.

The ALJ discussed Dr. Richardson and Dr. Tishler's opinions as follows:

The State psychiatric consultants at the initial and reconsideration level opined that the claimant is limited to static tasks that do not require her to remember more than 2-3 step instructions to complete the work that is assigned and do not require her to

> maintain intense concentration for extended periods or meet strict deadlines or work quotas, she is restricted to tasks that do not require a rapid pace, she would be limited to occasional superficial interaction with the general public and occasional needs based interaction with fellow co-workers, and would be limited to a static work environment that only undergoes occasional changes in the type of work that is conducted or the procedures necessary to complete the work that is assigned. This was not an adoption of the residual functional capacity from the prior decision dated January 14, 2015 due to new and material evidence. (Exhibits B2A and B4A) The undersigned finds the limitations suggested by the State psychiatric consultants persuasive and has accounted for these limitations in the adopted residual functional capacity as they are consistent with the evidence of record as more fully discussed above.

(Tr. 37).

Thus, the ALJ recognized that those consultants limited Plaintiff to static tasks requiring no more then 2-3 step instructions for her to remember and complete, and that did not require her to maintain intense concentrations or a rapid pace. The RFC ultimately included the following limitations: "Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any workplace changes." (Tr. 27). Although the RFC does not incorporate the "2-3 step instructions" limitation verbatim, Plaintiff fails to demonstrate that the RFC's limitations do not sufficiently account for these limitations.[4] Her assessment that the RFC excludes these limitations is rather conclusory. While Plaintiff does argue that "[i]t would appear that" these limitations are consistent with Reasoning Level 1 work rather than Reasoning Level 2 work, as suggested by the VE, Plaintiff fails to develop a compelling argument that there is an inherent conflict between the state agency psychologist's opinions and a job requiring Level 2 reasoning. (R. 12, PageID# 1279). Plaintiff asserts two of the jobs identified by the VE required

---

[4] *Cf. Yoho v. Comm'r of Soc. Sec.*, 168 F.3d 484 (4th Cir. 1998) ("There is no obligation, however, to transfer the findings on the [psychiatric review technique form] verbatim to the hypothetical questions.")

a reasoning level of 2 pursuant to the Dictionary of Occupational Titles (DOT), which Plaintiff, without support, deems to be in excess of the ability to carry out 2-3 step instructions. (R. 12, PageID# 1279). "The Court is not persuaded by [the plaintiff's] bare implication, without reference to any supporting case law or other applicable authority, that a limitation to understanding and remembering one-to-three-step instructions necessarily precludes Reasoning Level 2 and 3 jobs." *Lovell v. Astrue*, 2013 WL 174886, 2013 U.S. Dist. LEXIS 6350 at *25 (D. Vt. Jan. 16, 2013).[5] Although it may have behooved the ALJ to hew more closely to the express language utilized by the state agency psychologists, the court finds no error under the facts of this case.

### b)    Janelle Niese, CNP

Plaintiff contends that the ALJ erred by finding NP Niese's February 8, 2018, opinion unpersuasive because it relied heavily on Plaintiff's subjective reports of symptoms, which the ALJ determined were not consistent with the medical evidence in the record. (Tr. 37). The ALJ discussed NP Niese's opinion as follows:

> Jenelle Niese, CNP, a treating source, completed a medical source statement in which she opined that the claimant would need to lie down during an 8 hour workday outside of scheduled breaks and lunch, she can walk 0 blocks due to pain, she can sit 8 hours during an 8 hour workday, she can stand/walk 5-7 minutes during an 8 hour workday, she will requires unscheduled breaks during an 8 hour workday every hour for 10-15 minutes, she can never lift anything less than 10 pounds up nor anything weighing 10-50 pounds, she can grasp, turn, twist objections [sic], perform fine manipulation, and reach with her bilateral upper extremities only 25% of an 8 hour workday, and she would be absent from work

---

[5] *See also Fallon v. SSA Comm'r*, No. 1:10-cv-00058-JAW, 2011 U.S. Dist. LEXIS 4644, at *27 (D. Me. Jan. 14, 2011) ("The DOT does not assign a specific number of maximum steps to instructions and operations existing at reasoning levels two and three."); *Gott v. Comm'r of SSA*, No. 4:14-CV-00190, 2015 U.S. Dist. LEXIS 114332, at *10-11 (E.D. Tex. Aug. 28, 2015) ("Plaintiff is not precluded from performing jobs with reasoning levels of 2 or 3 when limited to performing 1-2 step instructions in a simple routine work environment.").

more than 4 times per month due to her impairments or treatment. (Exhibit B12F and B15F/99-100) The undersigned finds the opinion of Jenelle Niese, CNP, unpersuasive as the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints.

(Tr. 37).

Although the ALJ does not use the term supportability or consistency in the above evaluation, the Court concludes that the determination that the opinion appears to "heavily" rely on Plaintiff's subjective statements is a finding that the opinion lacked objective evidentiary support—relating to supportability and consistency. *See, e.g., Kearns v. Comm'r of Soc. Sec.*, No. 3:19cv1243, 2020 WL 2841707 at *9 (N.D. Ohio Feb. 3, 2020) (Greenberg, M.J.) ("While the ALJ did not use the terms 'supportability' or 'consistency' in her evaluation of Dr. Wagner's opinion, the Court agrees with the Commissioner that inherent in the ALJ's finding that Dr. Wagner's opinion appeared to be based largely on Kearns's subjective complaints is a finding that the opinion lacked the support of objective record evidence."), *report and recommendation adopted*, 2020 WL 2839654 (N.D. Ohio June 1, 2020).

Further, the ALJ described NP Niese's treatment notes pertaining to her opinion as follows:

[Plaintiff] attended an appointment with Jenelle Niese, CNP to have disability paperwork completed. The claimant reported that she was wearing splints for her carpal tunnel syndrome and cannot lift anything for even 1 to 2 minutes. She further reported that she is unable to walk a block without having pain in all her extremities, she has to take 15 minute breaks every hour, and she has trouble concentrating and focusing. Upon examination, the claimant was observed to be alert and oriented to person, place, and time, she displayed a normal heart rate and rhythm, she had normal breath sounds, she was observed to have 1 + bilateral edema to ankles, she had normal range of motion, and she had a negative Tinel and Phalen test. However, she was observed to display a depressed mood and she was slowed. The claimant's physical form was completed, an MRI of her left knee was reviewed and charted, and she was recommended to continue wearing wrist splints. (Exhibit B15F/95-98)

(Tr. 35).

A review of both the treatment records and NP Niese's opinion supports the ALJ's conclusion that the opinion is largely based on Plaintiff's subjective reports. (Tr. 1010-15). Further, Plaintiff does not challenge the accuracy of this statement, nor does she point to any objective evidence to support NP Niese's opinion. Instead, Plaintiff contends that "[t]here was no explanation of good reasons for questioning the reliability of Plaintiff's subjective complaints." (R. 12, PageID# 1280). Plaintiff does not present an argument to support this conclusory statement. *See, e.g., Kennedy v. Commissioner*, 87 Fed. Appx. 464, 2003 WL 23140056, at *1 (6th Cir. 2003) (citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)) (rejecting undeveloped arguments)).

Based on the record as a whole, the court concludes that the ALJ did not err in concluding that Plaintiff's subjective statements regarding her symptoms were not consistent with the objective record. Plaintiff fails to acknowledge or otherwise take issue with the ALJ's discussion and reliance on the state agency medical consultant opinions. (Tr. 37-38). The ALJ discussed these opinions, dated October 27, 2017 and February 26, 2018, as follows:

> The State agency medical consultants at the initial and reconsideration levels opined that the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently, she can sit/stand/walk about 6 hours in an 8 hour workday, she can frequently climb ramps and stairs, she can never climb ladders, ropes, or scaffolds, she can frequently crawl, she should avoid concentrated exposure to odors, dusts, gases, poor ventilation, etc., and she should avoid all exposure to hazards such as commercial driving, operating dangerous machinery, and unprotected heights. This was not an adoption of the residual functional capacity from the prior decision dated January 14, 2015 due to new and material evidence. (Exhibits B2A and B4A) The undersigned finds the limitations suggested by the State agency medical consultants partially persuasive, except additional records support that greater limitations are warranted as adopted in the residual functional capacity herein which account for the claimant's combined impairments including seizure disorder, osteoarthritis of the knee, carpal tunnel syndrome, lower extremity edema, and asthma. (Exhibits B9F/52-55, B11F/1-2, B15F/118-121, B17F/21, and hearing testimony)

(Tr. 37).

In sum, the ALJ determined that additional records provided more limitations than the state agency consultants opined, but not as severe as those opined by NP Niese, which were based on Plaintiff's subjective statements. Courts in this context do not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Accordingly, Plaintiff's argument is without merit.

**VI.    Conclusion**

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

IT IS SO ORDERED.

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: September 27, 2021

28